SALVATORE BALDASSARI *vs.* PRODUCE TERMINAL REALTY
CORPORATION.

Suffolk.   March 9, 1972. — May 5, 1972.

Present: TAURO, C.J., CUTTER, SPIEGEL, REARDON, & HENNESSEY, JJ.

*Snow and Ice. Notice. Corporation,* Corporate entity. *Landlord and Tenant,* Portion of premises in control of landlord, Landlord's liability to tenant or one having his rights, Snow and ice. *Negligence,* One owning or controlling real estate, Invited person, Snow and ice, Contributory negligence, Assumption of risk. *Evidence,* Presumptions and burden of proof, Conflicting statements of witness.

In a tort action to recover damages for injuries caused by falling on ice and snow, the plaintiff's notice of the time, cause and place

of his injury addressed to "Boston Market Terminal" was held to have been given to the defendant, Produce Terminal Realty Corporation, where the notice was reasonably to be construed as addressed to the defendant in view of the fact that the defendant owned, controlled and maintained a market facility known as the Boston Market Terminal on which the plaintiff was injured, and where, even if the notice were construed as addressed to the defendant's parent corporation, Boston Market Terminal Corporation, there was a sufficient nexus between the defendant and the parent corporation so that notice to the parent corporation constituted notice to the defendant as a matter of law. [743]

Where the defendant in a tort action owned, controlled and maintained a market facility for the use of member companies, one of which was the plaintiff's employer, the defendant owed the plaintiff a duty of reasonable care to maintain the facility in safe condition regardless of whether his employer was a tenant or a business invitee of the defendant [743–744]; and a finding of negligence on the part of the defendant toward the plaintiff was warranted on evidence that snow could have melted and flowed through unrepaired holes in a roof to create on a platform under the roof an unnatural accumulation of ice, on which the plaintiff fell and was injured, or that the ice was evident for sufficient time to enable the defendant to make the platform safe for travel [744].

Where the plaintiff in a tort action for injury sustained in a fall on ice both admitted that he had taken a chance by walking on visible ice and stated that he was walking where he knew there was no ice, it was for the jury to resolve the inconsistency and decide whether the plaintiff had assumed the risk of his fall and was contributorily negligent. [744–745]

TORT. Writ in the Superior Court dated November 28, 1966.

The action was tried before *Forte*, J.

*Edward S. Ronan* for the plaintiff.

*George M. Ford* (*Thomas D. Burns* with him) for the defendant.

SPIEGEL, J. In this action of tort the plaintiff seeks to recover for injuries sustained on February 3, 1966, as a result of a fall on an accumulation of snow and ice on a platform owned and controlled by Produce Terminal Realty Corporation (Produce). The declaration was in four counts. Two counts were against Produce and two counts were against Boston Market Terminal Company (Boston). During the course of the trial the plaintiff discontinued his action against Boston. We are here

concerned with two counts against Produce of an amended declaration. One count essentially alleges that the plaintiff's fall was on an "artificial and unnatural accumulation of snow and ice" negligently permitted to exist upon the above mentioned platform. The other count essentially alleges that the plaintiff's fall was on a "collection of ice" negligently allowed to remain on the platform. At the conclusion of the evidence, the trial judge allowed Produce's motion for directed verdicts. The case is before us on the plaintiff's exception to the allowance of the motion.

We summarize the evidence most favorable to the plaintiff. There was testimony from one James T. Hayes, the treasurer of both Boston and Produce, that Produce was a wholly owned subsidiary of Boston. In 1966, Produce "owned, controlled and maintained" a certain property in South Boston known as the "Boston Market Terminal" (Terminal). "The Terminal was then a market facility maintained by Produce for the exclusive use and convenience of about forty or forty-five produce companies which were licensed members of the Terminal organization. The [T]erminal consisted of three long freight houses with six platforms, one along each side of the houses, plus one platform at the end of one of the houses called the house eleven platform. The Terminal entrance was marked by a sign, Boston Market Terminal, and the houses were approachable on train tracks or on macadam and cobblestone roadways. Above the freight houses, connected by an overhead bridge, there were office spaces which Produce orally leased to various member companies. Sawyer & Company [Sawyer], the employer of the plaintiff, was a member company, which also leased office space under a tenancy at will. . . . Boston . . . occupied office space as a tenant of Produce, and paid Produce rent based in large part upon the unit charges Boston levied upon member companies, determined by the number of train or truck units that used the platforms for loading or unloading. Only trucks owned or controlled by member companies could use the

Terminal facility, with the exception of a very few trucks sent there on consignment."

Hayes also testified that Boston was not responsible for maintaining the facility. Produce's maintenance crew had the responsibility to maintain all three freight houses and their platforms, which included the shoveling, salting and sanding of all platforms. "The maintenance crew . . . would watch the storm elements and when a storm was subsiding or ending, they would go out and clear the platforms. The house eleven platform, being open to the elements on all sides was used less frequently in winter; however it was available for use by any member company at any time. This particular platform which was eight feet wide and 280 feet long, had a fiberglass roof, fastened by nails to wooden supports which resulted in roof leakage. The roof leakage was repaired at some time by replacing the nails with special type washers with calking." Hayes "did not know whether the roof was repaired in the winter of 1966."

The plaintiff testified that he worked as a delivery clerk at the Terminal for Sawyer. His duties "included the delivery of samples of produce, from . . . [Sawyer's] trucks on the various platforms, to the freight house, where he would set the samples up on display for sale; after which he would return the samples to the truck." On Wednesday, February 3, 1966, he began work at 4 A.M. He was instructed by his foreman, one Horace H. Henry, to deliver samples of cabbage to the freight house from a truck at house eleven platform. The platform had thirty truck stalls, fifteen located on each side. The cabbage truck was parked at number twelve stall. At 4 A.M. with the assistance of a flashlight, he walked out onto the platform, climbed aboard a side truck and rode to the cabbage truck at number twelve stall. While he was on the house eleven platform, he observed that the center of the platform was covered with "wavy ice" about "six inches thick." He walked on the edge of the platform where he observed no ice. When he returned Henry told him to stand by in case further samples were

required from this or other trucks that might come to that platform. At about 7:30 A.M., Henry told the plaintiff to deliver more samples from the cabbage truck. At this time, the plaintiff observed "that the middle of the platform was covered with thick wavy ice, that that ice was dangerous, but that there was a space along the edge of the platform where there were clear spaces without ice." The plaintiff stated, "I was walking where I knew there was no danger, where I knew there were no spots of ice." This clear space was about twelve inches wide and it appeared to the plaintiff to exist along the entire edge of the platform. In walking along this space at about 7:30 A.M., the plaintiff "wore rubbers, and watched carefully where he placed his feet." When he reached stall eleven, about fifteen or twenty feet from the cabbage truck in stall twelve, he "slipped on ice, fell and broke his ankle."

Prior to the date and time of his fall the plaintiff observed that there had been no snow fall or precipitation for several days. He further observed that "the roof of this house eleven platform leaked in the summer when it rained, and that it leaked in the winter when there was any snow resting and melting on it. On February 3, 1966, there was snow accumulation of several inches on the ground from a snow storm several days earlier."

The plaintiff further testified that there was no sand or rock salt on the ice on the platform, and that he had never seen any sand or rock salt there even though he had seen ice and snow there before.

One Joseph A. Locke, a maintenance man for Produce, who supervised a crew of between three and six, testified that he and his crew had the responsibility to salt, sand and shovel clear the various platforms in the winter of 1966. Locke or one of his assistants would inspect the condition of the platforms. Upon such inspection, or upon receiving any complaint from the member companies, Locke's crew would clear up, sand, or salt the platforms.

There was also testimony from Henry that there were

leaky spots in the roof over the house eleven platform, that these "spots were observable by walking down the platform, looking up and seeing the holes right through the roof" and that the icy condition of the platform was much the same as the day before the accident.

1. We first consider the question whether adequate notice of the time, place and cause of the plaintiff's accident was sent by the plaintiff. The plaintiff's notice, addressed to "Boston Market Terminal, 31 Hs Fargo Street, Boston, Massachusetts," was admitted in evidence at the trial without objection in so far as the record indicates.

The notice could be reasonably construed as notice to Produce in view of the fact that Produce maintained the market facility known as "Boston Market Terminal" and indicated by a sign bearing that name.

General Laws c. 84, § 21, as appearing in St. 1965, c. 378, § 3, provides, in part, that "no . . . notice shall be invalid by reason of any inaccuracy or misstatement in respect to the owner's name if it appears that such error was made in good faith and did not prevent or unreasonably delay the owner from receiving actual notice of the injury."

Although Produce was the actual owner of the facility where the accident occurred, Boston was the parent company of Produce, and maintained office space in the facility as a tenant of Produce. Hayes was the treasurer of both corporations. Even if it should be construed that the notice was addressed to Boston, we are of opinion that there was a sufficient nexus between Boston and Produce so that, within G. L. c. 84, § 21, notice to Boston constituted notice to Produce as a matter of law. Cf. *W. W. Britton Inc.* v. *S. M. Hill Co.* 327 Mass. 335, 339. See generally *Blanchard* v. *Stone's Inc.* 304 Mass. 634, 637–638; *Powers* v. *John C. MacInnes, Inc.* 343 Mass. 773.

2. Produce owned, controlled, and maintained the Terminal facility for the exclusive use of member companies. It owed to Sawyer, a member company, a duty to exercise reasonable care to maintain the premises in a safe condition. This is so whether we regard Sawyer's status on

the premises as that of a tenant (*Gilroy* v. *Badger*, 301 Mass. 494, 496)[1] or of a business invitee (*Delano* v. *Garrettson-Ellis Lumber Co., ante,* 500).[2]   This duty extended to the plaintiff as an employee of Sawyer. *Dreher* v. *Bedford Realty, Inc.* 335 Mass. 385, 388, and cases cited.

The jury would have been warranted in finding that snow melted and flowed through the holes in the roof over the house eleven platform which Produce negligently had failed to repair and thus created an unnatural accumulation of ice resulting in the plaintiff's fall.   Alternatively there was evidence which would have warranted the jury in finding that the ice accumulation "was in plain view for sufficient time to enable the defendant and his servants, in the exercise of reasonable care, to make . . . [the platform] safe [for travel].   *Watkins* v. *Goodall,* 138 Mass. 533.   *Frost* v. *McCarthy,* 200 Mass. 445. *Erickson* v. *Buckley,* 230 Mass. 467.   *Allan* v. *Essanee, Inc.* 309 Mass. 1." *Mansfield* v. *Spear,* 313 Mass. 685, 687.

3.  Produce argues that the plaintiff assumed the risk of a fall and was contributorily negligent.   In its argument Produce appears to rely on the following dialogue which occurred during cross-examination of the plaintiff:

COUNSEL FOR THE DEFENDANT: "Okay.   You were just as careful the second time as you were the first time, and you had the benefit of your experience in walking over

---

[1] The jury could have inferred that the letting occurred before the dangerous condition arose.   Moreover, the cases cited by Produce for the proposition that a landlord owes no duty to remove *natural* accumulations of snow and ice in the absence of an express or implied agreement to do so (*Carey* v. *Malley,* 327 Mass. 189; *Spack* v. *Longwood Apartments, Inc.* 338 Mass. 518) are not in point.

[2] There was sufficient evidence for the jury to find that Sawyer was a business invitee. Boston, the parent company of Produce, levied unit charges upon member companies according to the number of trains or trucks using the platforms. The rent which Boston paid Produce to occupy office space was based "in large part" upon these unit charges.   Thus, it could have been found, Sawyer's presence was induced by and of economic benefit to Produce.   See *Sweeney* v. *Old Colony & Newport R.R.* 10 Allen 368, 373; *O'Brien* v. *Shea,* 326 Mass. 681, 683.   Harper & James, Torts, § 27.12.

this dangerous condition once before. That's true, isn't it?"

THE JUDGE: "The answer is yes or no. You see, the stenographer has to take your answer. You just can't nod your head."

THE PLAINTIFF: "Well, I took a chance, that's all."

COUNSEL FOR THE DEFENDANT: "You took a chance?"

THE PLAINTIFF: "Yes."

COUNSEL FOR THE DEFENDANT: "You took a chance to go out there hoping you wouldn't fall, is that right?"

THE PLAINTIFF: "Well, I didn't look at it that way." The plaintiff also testified, "I was walking where I knew there was no danger, where I knew there were no spots of ice."

Any inconsistency in the plaintiff's testimony was for the jury to resolve. *Delano* v. *Garrettson-Ellis Lumber Co., ante,* 500, 502, and cases cited. Produce had the burden of proving the affirmative defences of contributory negligence and assumption of risk (*Manning* v. *Prouty,* 260 Mass. 399, 402). We rarely are able to hold, as matter of law, that this burden has been sustained. *Halley* v. *Hugh Nawn, Inc.* 356 Mass. 28, 30. *Sweenor* v. *162 State St. Inc., ante,* 524. We perceive no reason for doing so here.

*Exceptions sustained.*